01

02

03

04

05

06                        UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
07                                  AT SEATTLE

08  DAVID EDWARD GILES,                    )    CASE NO. C07-0533-JCC
                                           )
09        Petitioner,                      )
                                           )
10        v.                               )    REPORT AND RECOMMENDATION
                                           )
11  RON VAN BOENING,                       )
                                           )
12        Respondent.                      )
    _____    )
13

14        Petitioner David Edward Giles proceeds *pro se* in this 28 U.S.C. § 2254 habeas action.

15  He is in custody pursuant to a 2000 conviction by jury verdict of child molestation in the first

16  degree (Count I) and rape of a child in the first degree (Count II).  (Dkt. 22, Ex. 1.)  Petitioner

17  raises nine grounds for relief in his habeas petition.  (Dkt. 1.)  He also requests discovery (Dkt.

18  33) and an evidentiary hearing (Dkt. 34).  Respondent filed an answer to the petition with relevant

19  portions of the state court record.  (Dkts. 20, 22 & 52.)  Respondent argues that, while properly

20  exhausted, all of petitioner's grounds for relief lack merit.  Respondent also argues against the

21  requests for discovery and an evidentiary hearing.  (Dkts. 38 & 39.)  Petitioner objects to

22  respondent's arguments in a reply.  (Dkt. 32.)

REPORT AND RECOMMENDATION
PAGE -1

01    The Court has considered the record relevant to the grounds raised in the petition,

02 including all hearing transcripts.  For the reasons discussed herein, it is recommended that

03 petitioner's habeas petition and his motions be denied and this action dismissed.

04                                                              I

05    The Washington Court of Appeals described petitioner's case as follows:

06    David Giles has a daughter, E., born in 1985 and a son D., born in 1990.
       Giles and the children's mother, Rhinee Yeung, were divorced in 1996.  After the
07     divorce, the children lived with Yeung but stayed with Giles every other weekend and
       every Thursday.  Giles remained in the family home at Squawk Mountain until April
08     1997, when he moved to an apartment in Issaquah across the street from his
       daughter's middle school.
09
10    Beginning in the summer of 1995, Giles met and had telephone conversations
       with women through an online dating service called Nightline Services. [Participants
11     call into a chat line where men and women can talk to each other, leave
       advertisements or send messages to each other.] Over the next two years, Giles spent
12     approximately 1,900 hours and $32,000 on this chat line service.

13    On the night of April 21, 1997, Michelle Harris had a telephone conversation
       on Nightline Services with a man who identified himself as David.  After exchanging
14     general information, David explained that "he was looking for a woman who had
       unique qualities."  Harris testified that David said "he was into, being involved with
15     small children, sexually involved with young children . . . and then he mentioned incest
       and bestiality."

16    Harris tried to find out if David had children because she was concerned that
       he might be sexually abusing them.  David told Harris that he had two children, a son
17     and daughter.  He "went into details about being involved with [t]his daughter,
       different things he had done to her . . . that he had massaged her vaginal area, that he
18     had performed oral sex on her." He said that he walked around the house nude, with
       an erection, in front of his children.  David also said that he tried to penetrate his
19     daughter's vagina but she had resisted.

20    David told Harris that he wanted to have sex with his daughter and with his
       son, "mainly perform oral sex on his daughter," and to have sex with him in "a
21     situation where his daughter would walk in" and discover them. [. . . David also said
       that he wanted to go with Harris to the Central District and find a family who used
22     crack and buy them crack.  "That way he could get them high and have sex with their

01 children, watch them have sex with their children." . . . ] David tried to make
arrangements to meet Harris the next weekend, when his children would be visiting
02 him.  Harris testified that she was alarmed by this conversation but engaged in it
because she was concerned about his children.

03

04        Early the next morning Harris called her best friend, Nephtali Stackhouse, and
then the Lynwood [sic] Police Department to report the conversation and her
concerns about the children.  The police department suggested she contact Child
05 Protection Services (CPS).  CPS told Harris that she had not obtained enough
identifying information for them to investigate.  Harris decided to call David again
06 that evening on the Nightline Services and asked Stackhouse to listen in and take
notes.  During this conversation, David provided more information, including his
07 home telephone number, the names and ages of both his children, the universities he
had attended, and that he had recently moved from a secluded farmhouse to an
08 apartment in Issaquah.

09        The next day Harris and Stackhouse called CPS to provide the additional
information obtained from David.  CPS and the King County Sheriff's Office
10 investigated and identified the male caller as David Giles.

11        On May 5, 1997, a CPS investigator and a King County detective contacted
E. at her school. [Believing E. would be more comfortable in the presence of people
12 she knew, the school principal, vice principal and sixth grade counselor were in the
room during the CPS interview.] After asking some general questions, the CPS
13 investigator asked E. whether she knew the difference between a "good touch" and
a "bad touch."  E. was uncommunicative, kept her head down, would not look at
14 anyone, and never made eye contact.  In response to a question about whether anyone
had touched her private parts, she shook her head no, but did not answer verbally.

15

16        Since the divorce, E. and D. had been seeing a therapist, Tona McGuire.  Two
days after the conversation at school, E. went to see McGuire.  Prior to the session,
William Nathe, E.'s and D.'s court appointed guardian ad litem, told McGuire that
17 E.'s father had told someone on the phone that he had sexual contact with his children
and CPS had interviewed E.

18

19        At the beginning of the session with McGuire, E. seemed in good spirits.
They played a game and talked about school and gymnastics.  Then, McGuire asked
E. about the interview.  E. said it had been about "bad touching."  McGuire asked
20 whether E.'s mother or father were "behaving in any way that makes her
uncomfortable."  McGuire testified that at that point E. became "very agitated":

21

    She walks around the room.  She is shaking.  She won't talk.  She goes to
22     a corner of the room, curls up in a ball, shaking.  And remains unresponsive

REPORT AND RECOMMENDATION
PAGE -3

01   for the remainder of the session, which was probably about another ten minutes.

02

03   McGuire recommended that E. should be evaluated at the East Side Sexual Assault Center (ESSAC).  An evaluator at ESSAC, saw E. five times between May 13 and June 6.  The evaluator testified that at the third session she told E. "we needed

04   to talk.  And I told her that I understand her father had told someone he did something to her."  E. told her something happened "just one time."  E. used

05   anatomical dolls to indicate where Giles touched her.  During the sessions, E. also disclosed an incident of oral sex with her father.

06

07   After E. returned to her regular sessions with McGuire, she eventually told McGuire that Giles had touched her twice, once involving digital penetration and once, oral sex.

08

09   Giles was charged with one count of first degree child molestation and one count of first degree rape of a child.

10   At trial, E. testified that when she was eleven years-old, sometime between mid-June 1996 and March 31, 1997, Giles molested her.  E. said that when she and

11   her brother stayed at Squawk Mountain, they all slept in the same bed.  E. described one night when D. was asleep and Giles asked if she wanted a "butt massage."  She

12   said okay.  Giles began massaging her buttocks, underneath her pajamas and underwear.  He then rubbed her vagina and inserted a finger.  Giles removed his

13   underwear and she felt his penis against her back.  E. got up, went into her own room and cried herself to sleep.

14

15   When Giles moved to the Issaquah apartment, E. generally slept in her own room and D. slept with Giles.  One night, while tucking E. into bed, E. testified that

16   Giles told her he was going to give her a "wild goose."  Giles then removed the covers and pulled her pajama pants down.  E. said Giles "lifted my legs, and he pulled

17   my pants down and he was holding me up like you'd hold a baby's legs up when you're changing its diaper."  She said Giles performed oral sex on her.  When E.

18   asked what he was doing, he said he was trying to make her feel good.  He told her not to tell McGuire.  Eventually he asked if she wanted him to stop.  She said yes, and he left.

19

20   At trial, Giles admitted he talked to Harris on Nightline Services, but disagreed with Harris's version of their conversations.  Giles claimed it was Harris

21   who expressed interest in sex with children.  He testified that although he had no interest in this, he eventually agreed that he was interested in sex with children just to end the conversation with Harris.

22

REPORT AND RECOMMENDATION
PAGE -4

Giles denied that he ever sexually abused his daughter. He insisted that Harris's allegations not only were false but were also instigated by Yeung to deprive him of custody of his children. [There was no evidence that Harris and Yeung knew each other. Giles also made this claim in spite of the fact that after the allegations surfaced, Yeung told McGuire she did not think Giles molested E.]

In the first trial, the jury was unable to reach a verdict. At the second trial in May and June of 2000, the jury found Giles guilty on both counts. He was sentenced within the standard range. Giles appeals the jury's verdict and his sentence.

(Dkt. 22, Ex. 2 at 2-6; text of some footnotes bracketed, other footnotes omitted.) The trial court sentenced petitioner to 89 months of confinement on Count I and 136 months confinement on Count II, with the terms to run concurrently. (*Id.*, Ex. 1 at 3.)

Petitioner appealed with the assistance of counsel. (*Id.*, Ex. 3.) He raised five assignments of error:

1.     The trial court abused its discretion by excluding relevant and admissible evidence necessary to the presentation of Mr. Giles' defense.

2.     The prosecutor committed misconduct during closing argument.

3.     The trial court erred in replaying a video tape for the jury without Mr. Giles being present.

4.     Cumulative error deprived Mr. Giles of his right to a fair trial.

5.     The trial court erred in concluding it did not have the authority to impose an exceptional sentence below the standard range.

(*Id.* at 1-2.) Petitioner submitted two *pro se* supplemental briefs, raising nine assignments of error:

1.     The trial court erred by allowing hearsay evidence in violation of defendant's constitutional right to confrontation.

2.     The trial court erred in allowing expert witnesses to conclude the credibility and guilt of the defendant in violation of constitutional guarantee of due process.

REPORT AND RECOMMENDATION
PAGE -5

01       3.      The trial court erred by allowing the state to treat constitutionally protected behavior as an aggravating circumstance violating defendant's guaranteed
02              right of due process.

03       4.      The trial court erred by excluding relevant and admissible evidence necessary to the constitutional right to present a defense.

04

05       5.      The trial court erred by excluding relevant and admissible evidence depriving defendant of his constitutional right of confrontation.

06       6.      The trial court erred by excluding relevant and admissible evidence limiting defendant's ability to examine witnesses and depriving him of his
07              constitutional right to compulsory process.

08       7.      The prosecutor committed misconduct in the trial, closing and rebuttal arguments depriving defendant of a fair trial.

09

10       8.      Failure of the trial court to excuse biased jurors is per se plain error in a structurally defective trial.

11       9.      Decision of defense counsel not to challenge jurors, who admit they "can't be fair" or who by law are conclusively presumed to be biased, has no strategic
12              justification and is ineffective assistance of counsel.

13  (*Id.*, Ex. 5 at 1 and Ex. 8 at 1.)  The Washington Court of Appeals affirmed the convictions and

14  denied a motion for reconsideration.  (*Id.*, Exs. 2 & 11.)

15        Through counsel, petitioner filed a petition for review in the Washington Supreme Court.

16  (*Id.*, Ex. 12.)  He raised the following issues for review:

17       1.      Over objection from defense counsel, the trial court replayed a videotape exhibit for the jury outside of the presence of Mr. Giles and his attorney.  No
18              third party was present and no record of what occurred was made.  Did the Court of Appeals err in finding Mr. Giles failed to establish a sufficient
19              likelihood of prejudice from the improper communication?

20       2.      The trial court made numerous evidentiary rulings that limited Mr. Giles's ability to present a defense and to confront witnesses, including excluding
21              evidence supporting his theory of a fabricated accusation and evidence demonstrating witnesses' biases.   Given the centrality of the excluded
22              evidence to Mr. Giles's defense, did the Court of Appeals err in determining

REPORT AND RECOMMENDATION
PAGE -6

Mr. Giles's right to present a defense and his right to confront witnesses were not violated?

3.  The Court of Appeals recognized that the prosecutor misstated evidence during argument, but found the misstatement insignificant. The court further determined that the prosecutor did not engage in any other misconduct, and failed to consider Mr. Giles's assertion that the prosecutor committed misconduct by arguing excluded evidence did not exist. Did these determinations and the court's failure to resolve all issues violate Mr. Giles's constitutional right to a fair trial?

4.  The trial court allowed witnesses to testify as to hearsay statements because it believed they came under the exception allowing for admission of statements made for the purpose of obtaining medical treatment. Given the fact that the declarant did not knew she was receiving treatment, was Mr. Giles's right to confront witnesses violated?

5.  A criminal defendant is entitled to a fair and impartial jury. The trial court failed to excuse jurors for cause despite evidence of bias. The Court of Appeals recognized several jurors expressed strong feelings about child abuse, but refused to grant Mr. Giles relief. Did this decision violate Mr. Giles's right to a fair and impartial jury?

6.  Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Where trial counsel fails to strike jurors who have expressed personal biases against the accused, is counsel's performance constitutionally infirm?

7.  Did conclusions by witnesses regarding Mr. Giles's guilt, an ultimate legal conclusion, violate his right to due process and a jury trial?

8.  Did the cumulative effect of the above-mentioned errors deprive Mr. Giles of his constitutional right to a fair trial?

(*Id.* at 1-3.) The Washington Supreme Court denied the petition for review. (*Id.*, Ex. 13.) The Washington Court of Appeals issued its Mandate on September 28, 2004. (*Id.*, Ex. 14.)

While his direct appeal was pending, petitioner, acting *pro se*, filed a personal restraint petition and moved to consolidate the petition with his direct appeal. (*Id.*, Exs. 15 & 16.) The Washington Court of Appeals denied the motion for consolidation and stayed the personal

REPORT AND RECOMMENDATION
PAGE -7

01  restraint petition pending resolution of the direct appeal. ( *Id*., Ex. 17.)  Petitioner filed an

02  emergency motion for a stay of the direct appeal proceedings and a motion for discretionary

03  review with the Washington Supreme Court. (*Id*., Exs. 18 & 19.)  The Commissioner of the

04  Washington Supreme Court denied the motion for review and denied as moot the motion for a

05  stay. (*Id*., Ex. 20.)  The Washington Supreme Court subsequently denied a motion by petitioner

06  to modify the Commissioner's ruling. ( *Id*., Exs. 21 & 22.)  Petitioner moved to withdraw his

07  personal restraint petition. (*Id*., Ex. 23.)  The Washington Court of Appeals granted the motion

08  to withdraw and issued a certificate of finality on March 7, 2003.  (*Id*., Exs. 24 & 25.)

09          Again acting *pro se*, petitioner filed a second personal restraint petition on August 19,

10  2005.  (*Id*., Exs. 26 & 27.)  He raised thirteen issues:

11          1.      Because defense counsel was not adequately prepared for trial, defendant was
                    forced to choose between speedy trial and effective assistance of counsel.
12

13          2.      Counsel's failure to challenge the testimony of state witness Dr. Yeung,
                    petitioner's ex-wife, amounted to a deprivation of the Sixth Amendment right
                    to counsel.
14

15          3.      Counsel's failure to use evidence to challenge the testimony and expose the
                    fraud of state witness Nathe amounted to a deprivation of the Sixth
                    Amendment right to counsel.
16

17          4.      Defense counsel failed to use evidence at hand which impeached the testimony
                    of Tona McGuire, depriving petitioner of his Sixth Amendment protections.
18

            5.      The Court erred in excluding the Yeung writings, denying petitioner the
19                  protections guaranteed under the Confrontation Clause.

20          6.      The Court denied petitioner the protections afforded by the Confrontation
                    Clause by excluding medical evidence which supported the defense argument
21                  that Yeung planned to falsely accused [sic].

22          7.      Preaccusatorial delay was unjustified, depriving the defendant of due process
                    protections afforded by the 5th and 14th Amendments.

REPORT AND RECOMMENDATION
PAGE -8

8.  Defense Counsel was ineffective for failure to object to rebuttal testimony which was cumulative and carried tainted evidence already excluded by the Court.

9.  Trial counsel was ineffective because he failed to present character testimony to counter the prosecutor's misconduct when he misrepresented the facts in an unabated attack on defendant's credibility.

10.  When trial counsel moved for mistrial he was ineffective for not providing all the facts.

11.  Petitioner's Sixth Amendment protections were violated when the trial court made State's forensic interviewer unavailable to cross-examinations by refusing evidence of Todd's personal and professional history of contriving allegations.

12.  Are interviews in child sex abuse cases testimonial and therefore inadmissible?

13.  Multiple errors cumulatively so infected the trial with unfairness as to constitute a due process violation.

(*Id.*, Ex. 26 at i-vi.)  In a separate brief, petitioner also asserted that the United States Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), was "an intervening change in the law as it pertains to protections under the Confrontation Clause of the Sixth Amendment" and raised the issue of whether "a restriction on cross-examination [could] be so severe as to make the witness 'unavailable' and constitute a violation of a defendant's Sixth Amendment right of confrontation[.]"  (*Id.*, Ex. 27 at i.)  The Washington Court of Appeals dismissed the petition. (*Id.*, Ex. 30.)

Petitioner filed a motion for discretionary review with the Washington Supreme Court, raising the following issues for review:

1.  May a Chief Judge dismiss a PRP without referring it to the full Court, when the same Court has twice conceded error on a claim, and the error is not clearly harmless under the most forgiving interpretation from incomplete facts

REPORT AND RECOMMENDATION
PAGE -9

(on direct appeal), and clearly not harmless under the much darker aspect with complete facts (PRP)? . . .

2. When a defendant is physically blocked by the bailiff from being present during the playback of evidence to the jury, but the prosecutor is present, can the error ever by harmless? Is the error constitutionally fatal under the due process clause of the 5th and 14th Amendments, and the Confrontation Clause of the 6th Amendment?

3. Does preaccusatorial delay of 21 months, from public accusation to charging, deprive the defendant of his due process protections of the 5th and 14th Amendments?

4. Under Crawford, can restrictions on cross examination be so severe as to make a witness "unavailable" and constitute a violation of a defendant's 6th Amendment right to confrontation?

5. Under a correct reading of California v. Green, harmonized with Crawford, is a defendant protected against corroborative hearsay testimony from ex parte testimonial forensic interviews, even when the out of court declarant testifies, if it can be shown to be unreliable?

6. Was it a violation of a defendant's right to counsel under the 6th Amendment when defense counsel remained ignorant of facts and evidence for failure familiarize [sic] himself with the record from the first trial, evidence provided him by defendant's first attorney, Mark Mestel, and his investigator, impeachment evidence which sat unexamined and unused on the defense table, and failed to contact or to call witnesses who would have refuted State's witnesses and provided exculpatory evidence?

7. Is it a violation to defendant's right to counsel that defendant was forced to choose between speedy trial (motivated by a concern for his young son who was in the care of his mother who previously tried to kill him) and competent counsel, who immediately went on paternity leave upon assignment to this case and had not litigated a case in two years?

8. Is it per se error when appointed counsel failed to notify defendant that his wife worked as an attorney in the prosecutor's office; that the implied prejudice from a potential conflict of interest compromised his 6th Amendment protection of a right to counsel?

9. Was it effective assistance when defense counsel failed to object to cumulative rebuttal testimony which carried taint, and which had been excluded from

REPORT AND RECOMMENDATION
PAGE -10

01       trial?

02   10.   When a prosecutor uses a rebuttal witness at the end of trial to carry taint, is
           it the legal equivalent of using guilty assuming hypotheticals, which undermine
03         the presumption of innocence and violate a defendant's right to due process?

04   11.   Was defense counsel ineffective when he failed to use character witnesses on
           questions of reputation for sexual morality? . . .

05
     12.   Can errors in trial, seemingly separate, interact and produce a chemistry of
06         prejudice much greater than the sum of their parts, and so infect a trial with
           unfairness as to constitute a due process violation?

07

08   (*Id.*, Ex. 31 at 1-5 (numbering of arguments corrected).)  The Commissioner of the Washington

09   Supreme Court denied review.  ( *Id.*, Ex. 32.)  The Washington Supreme Court subsequently

10   denied petitioner's motion to modify the Commissioner's ruling.  ( *Id.*, Exs. 33 & 34.)  The

11   Washington Court of Appeals issued its certificate of finality on November 17, 2006.  (*Id.*, Ex.

12   35.)

13                                              II

14       Petitioner now raises nine grounds for habeas relief:

15   1.    Petitioner's right to counsel was violated by multiple instances of ineffective
           assistance, violating the Sixth and 14th Amendments . . . .
16
     2.    When a defendant is denied his right to be present during the playback of
17         evidence for the jury, but the prosecutor is present, the error cannot be
           harmless, in violation of the Fifth, Sixth and 14th Amendments . . . .
18
     3.    Pre-accusatorial delay was unjustified, depriving the petitioner of due process
19         protections violating the Fifth and 14th Amendments . . . .

20   4.    Restrictions on cross examination were so severe as to make witnesses
           "unavailable" to cross examination at trial, violating the petitioner's right to
21         confrontation under <u>Crawford</u> and the right to present a defense (in violation
           of the Fifth, Sixth and 14th Amendments . . . .
22

REPORT AND RECOMMENDATION
PAGE -11

01
02
03

5.  Hearsay testimony from ex parte forensic interviews should have been excluded because they were absent particularized guarantees of trustworthiness that the child declarant was likely to be telling the truth at the time of the statement, in violation of the Sixth and 14th Amendments . . . .

04
05

6.  Improper argument in closing and rebuttal compromised the petitioner's ability to obtain a fair trial, in violation of the Fifth, Sixth and 14th Amendments . . . .

06
07

7.  Failure of the Court to exclude biased jurors is plain error resulting in a structurally defective trial, in violation of the Fifth, Sixth and 14th Amendments . . . .

08
09

8.  Conclusions by lay and expert witnesses regarding the ultimate issues violate a defendant's right to due process, in violation of the Fifth and 14th Amendments . . . .

10

9.  Multiple errors cumulatively so infected the trial with unfairness as to constitute a due process violation, in violation of the Fifth and 14th Amendments . . . .

11
12  (Dkt. 1 at 1, 17, 19, 26, 34, 38, 43, 45-46.)

13      Respondent concedes and the Court agrees that petitioner properly exhausted his grounds

14  for relief by presenting them to the Washington Supreme Court as federal constitutional claims.

15  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (to exhaust state remedies, a petitioner

16  must present each of his claims to the state's highest court) and *Hiivala v. Wood*, 195 F.3d 1098,

17  1106 (9th Cir. 1999) (a petitioner must "alert the state courts to the fact that he was asserting a

18  claim under the United States Constitution.") (citing *Duncan v. Henry*, 513 U.S. 364, 365-66

19  (1995)).  The Court, therefore, turns to the merits of petitioner's claims.

20                                                III

21      This Court's review of the merits of petitioner's claims is governed by 28 U.S.C. §

22  2254(d)(1).  Under that standard, the Court cannot grant a writ of habeas corpus unless a

01  petitioner demonstrates that he is in custody in violation of federal law and that the highest state

02  court decision rejecting his grounds was either "contrary to, or involved an unreasonable

03  application of, clearly established Federal law, as determined by the Supreme Court of the United

04  States." 28 U.S.C. § 2254(a) and (d)(1).  The Supreme Court holdings at the time of the state

05  court decision will provide the "definitive source of clearly established federal law[.]" *Van Tran*

06  *v. Lindsey*, 212 F.3d 1143, 1154 (9th Cir. 2000), *overruled in part on other grounds by Lockyer*

07  *v. Andrade*, 538 U.S. 63 (2003).   A state-court decision is contrary to clearly established

08  precedent if it "'applies a rule that contradicts the governing law set forth in'" a Supreme Court

09  decision, or "'confronts a set of facts that are materially indistinguishable'" from such a decision

10  and nevertheless arrives at a different result.  *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting

11  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).

12  A.    Ground One

13       Petitioner alleges ineffective assistance of counsel in his first ground for relief.  Specifically,

14  he asserts the ineffectiveness of his counsel in the following regards:

15       1.    Although a complicated cause, defense counsel could have prepared from the
             abundance of resources available to him, but did not.

16

17       2.    Defense counsel failed to familiarize himself with the record from the first
             trial.

18       3.    It was a violation of defendant's right to counsel when he was forced to
             choose between speedy trial and competent counsel.

19

20       4.    Counsel's failure to prepare may have been a function of a conflict of interest.

21       5.    Defense counsel failed to expose the fraud of GAL Nathe.

22       6.    McGuire had became a terror, an instrument of punishment for Yeung, and
             gave false testimony to protect her career, and Ellis failed over and over to

REPORT AND RECOMMENDATION
PAGE -13

01        impeach her.

02    7.    When the State erred, opening the door, defense counsel was ineffective for
            his failure to challenge the testimony of Yeung.
03
04    8.    Trial counsel failed to strike admittedly biased jurors, depriving the petitioner
            of his right to counsel.

05    9.    Defense counsel was ineffective for failure to object to rebuttal testimony
            which was cumulative and carried taint specifically excluded by the court.
06
07    10.   After the court acknowledged the significance of the prosecutor opening the
            door, counsel was ineffective when he failed to call witnesses and present any
            of the abundantly available character testimony . . . .
08

09  (Dkt. 1 at 1-17.)

10        The Sixth Amendment guarantees a criminal defendant the right to effective assistance of

11  counsel.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).   Courts evaluate claims of

12  ineffective assistance of counsel under the two-prong test set forth in *Strickland*.   Under that test,

13  a defendant must prove that (1) counsel's performance fell below an objective standard of

14  reasonableness and (2) a reasonable probability exists that, but for counsel's error, the result of

15  the proceedings would have been different.  *Id*. at 687-694.

16        When considering the first prong of the *Strickland* test, judicial scrutiny must be highly

17  deferential.  *Id*. at 689.  There is a strong presumption that counsel's performance fell within the

18  wide range of reasonably effective assistance.  *Id*.  The Ninth Circuit has made clear that "'[a] fair

19  assessment of attorney performance requires that every effort be made to eliminate the distorting

20  effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

21  evaluate the conduct from counsel's perspective at the time.'"  *Campbell v. Wood*, 18 F.3d 662,

22  673 (9th Cir. 1994) (quoting *Strickland*, 466 U.S. at 689).

REPORT AND RECOMMENDATION
PAGE -14

01    The second prong of the *Strickland* test requires a showing of actual prejudice related to

02 counsel's performance.  The reviewing court need not address both components of the inquiry if

03 an insufficient showing is made on one component.  *Strickland*, 466 U.S. at 697.  Furthermore,

04 if both components are to be considered, there is no prescribed order in which to address them.

05 *Id*.

06    For the reasons described below, the Court concludes that the state court findings as to

07 these arguments were not contrary to nor an unreasonable application of federal law, and that

08 petitioner otherwise fails to demonstrate that his trial counsel's assistance was constitutionally

09 deficient.

10    1.    <u>Inadequate Preparation and Performance Generally</u>:

11    In his first three arguments, petitioner asserts that his trial counsel, Jeff Ellis, did not

12 adequately prepare using the resources available to him, failed to familiarize himself with the

13 record from the first trial, and forced petitioner to choose between the right to a speedy trial and

14 the right to competent counsel.  With respect to the latter argument, petitioner asserts that Ellis

15 went on paternity leave upon assignment to the case, worked a reduced schedule, and had not

16 litigated a case in two years.

17    Respondent counters these arguments, first, with reference to the State's response to

18 petitioner's personal restraint petition:

19    The record refutes this claim.  Ellis entered the case in February 2000.  On
20 March 3, 2000, Ellis informed the trial court that he had "a bookshelf with two
   shelves full of documents relating to this case," and that he had read about 75% of
   those documents at that point.  Ellis also informed the court that he had made
21 arrangements to obtain the transcript of the first trial, and that the would begin
   reading it immediately.  All this while Ellis was technically still on parental leave –
22 hardly an indication of an attorney who would go to trial unprepared.  At the close

REPORT AND RECOMMENDATION
PAGE -15

01  of the March 3rd hearing, Ellis told the court that his client had made it clear that he
    wanted his trial to begin on March 27th, and that Ellis expected to be ready on that
02  date. [The parties were in court preparing for voir dire on May 1, 2000. The parties
    gave opening statements on May 11, 2000.]
03
        The record is replete with evidence of Ellis's careful preparation for trial. Ellis
04  argued forcefully and knowledgeably for the court to reconsider certain issues that
    had been resolved against Giles in the first trial, including the scope of cross-
05  examination of ESACC counselor Kerry Todd and the admissibility of statements that
    Giles had made to several mental health counselors.
06
        Ellis went beyond the issues from the first trial. He obtained funding for Dr.
07  John Yuille to testify as an expert witness for the defense on child interviewing
    techniques. Ellis successfully offered Giles's home video showing his interactions
08  with his children, and then convinced the trial court to reconsider its earlier limitation
    and admit the entire video.
09
        During trial, based on the State's cross-examination, Ellis argued at
10  considerable length for admission of Rhinee Yeung's writings, in support of his
    client's theory that Yeung had set up the allegations against him. Ellis demonstrated
11  his detailed knowledge of relevant documents in his highly effective cross-examination
    of William Nathe, the guardian ad litem for Giles's children.
12
13  (Dkt. 22, Ex. 28 at 13-15; internal citations omitted; text from footnote bracketed.) Respondent

14  also points to the finding of the Washington Court of Appeals on this issue:

15          In his first ground, Giles contends his attorney was not adequately prepared
    for trial, such that he was forced to choose between effective assistance of counsel
16  and a speedy trial. But a review of the record reveals that defense counsel argued for
    reconsideration of evidence rulings from the first trial, appeared thoroughly familiar
17  with the transcript of the first trial, the facts of the case and applicable law, vigorously
    cross-examined witnesses, made objections, and fully and carefully argued the case
18  to the jury. Giles's bare assertions and conclusory allegations regarding his attorney's
    preparation amount to little more than disagreements over trial strategy and do not
19  demonstrate deficient performance.

20  (*Id.*, Ex. 30 at 3.)

21      As found by the state court, petitioner's allegations as to his counsel's preparation and

22  performance generally are no more than conclusory. The record in this case contradicts

REPORT AND RECOMMENDATION
PAGE -16

01  petitioner's conclusory allegations. (*See* Dkt. 52, Exs. 41-62.)

02       2.     Conflict of Interest:

03       In his fourth argument, petitioner asserts that his counsel's alleged failure to prepare may

04  have been the result of a conflict of interest based on the fact that his wife was employed by the

05  prosecutor's office. As indicated above, petitioner fails to demonstrate the insufficient preparation

06  of his counsel. Nor does the mere fact that his counsel's spouse worked for the prosecuting

07  attorney's office support a finding of constitutionally deficient assistance of counsel.

08       3.     Cross-Examination of Guardian Ad Litem William Nathe:

09       Petitioner asserts ineffective assistance through his counsel's failure to expose fraud by

10  guardian ad litem William Nathe. He maintains that Nathe misstated facts regarding his contact

11  with witnesses Michelle Harris and Nephtali Stackhouse. Respondent counters this argument by

12  pointing to the State's detailed response to the argument as raised in petitioner's personal restraint

13  petition (Dkt. 22, Ex. 28 at 22-24) and the finding of the Washington Court of Appeals (*id.*, Ex.

14  30 at 4).

15       The Washington Court of Appeals rejected petitioner's argument as to Nathe:

16          In his third ground, Giles complains that his attorney was unprepared and
    deficient in cross-examining Guardian Ad Litem Bill Nathe, Michelle Harris and
17  Nephtali Stackhouse who testified that Giles confessed his molestation of his daughter
    on a telephone chatline, and former Child Protective Services Investigator Kimberly
18  O'Hagen. Giles identifies a number of minute details in the testimony of these
    witnesses that defense counsel failed to address to his satisfaction in cross-
19  examination, including Nathe's alleged fraud, discrepancies in dates, and differences
    between statements made in the first and second trials. Again, the record reveals that
20  counsel made tactical decisions in examining these witnesses, focusing on areas that
    he later returned to in his comprehensive and carefully constructed closing argument.
21  The fact that Giles wished his attorney to employ his own strategy or that of his
    former attorney handling the first trial does not establish deficient performance.

22

REPORT AND RECOMMENDATION
PAGE -17

01  (*Id.*, Ex. 30 at 4.)

02      Petitioner fails to demonstrate that his counsel's performance with respect to Nathe fell

03  below an objective standard of reasonableness.  "Under *Strickland*, counsel's representation must

04  be only objectively reasonable, not flawless or to the highest degree of skill."  *Dows v. Wood*, 211

05  F.3d 480, 487 (9th Cir. 2000) (citing  *Strickland*, 466 U.S. at 688-89).  Moreover, "[a] reasonable

06  tactical choice . . . is immune from attack under *Strickland*."  *Gerlaugh v. Stewart*, 129 F.3d 1027,

07  1033 (9th Cir. 1997) (citing *Strickland*, 466 U.S. at 689-91).  Therefore, a tactical decision to, for

08  example, refrain from asking a particular line of questions, is given great deference and need only

09  meet the objectively reasonable standard.  *Dows*, 211 F.3d at 487 (concluding that, while the trial

10  counsel may have conducted "a more thorough and vigorous examination of the alleged rape

11  victim, . . . the state courts' conclusion that his conduct was objectively reasonable is not an

12  incorrect application of Supreme Court precedent or an unreasonable determination of fact

13  sufficient to grant a petition for habeas corpus under section 2254.")

14      Here, the record supports the sufficiency of petitioner's counsel's performance as it related

15  to the cross-examination of Nathe.  (*See* Dkt. 52, Ex. 50 at 154-89 and Ex. 51 at 3-45, 73-84.)

16  Petitioner's arguments, accurately summarized in the State's response to his personal restraint

17  petition (*see* Dkt. 22, Ex. 28 at 22-24), present an attack on tactical decisions of his trial counsel

18  and fail to demonstrate that his counsel's performance was not objectively reasonable.

19      4.    Cross-Examination of Counselor Tona McGuire:

20      Petitioner contends that his counsel repeatedly failed to impeach the testimony of his

21  daughter's counselor, Tona McGuire.  He focuses particularly on McGuire's testimony as to the

22  change in his daughter's behavior following questioning as to abuse, contending that the

01 observation was not contained in McGuire's chart notes and that his daughter's behavior was not

02 unusual, and, rather, a reflection of her behavior while not taking her medication for Attention

03 Deficit Disorder. Respondent counters this argument by pointing to the State's detailed response

04 to the argument as raised in petitioner's personal restraint petition (Dkt. 22, Ex. 28 at 24-26) and

05 the finding of the Washington Court of Appeals (*id.*, Ex. 30 at 5).

06      In considering this issue, the Washington Court of Appeals held as follows:

07      . . . Giles contends that his attorney failed to competently cross-examine E.'s
       counselor, Tona McGuire. He complains that defense counsel failed to use certain

08     evidence to demonstrate that McGuire blamed Giles for the children's problems with
       their mother, and lied about various matters during her testimony, including E.'s

09     history of behavior, meetings with Giles, her involvement in custody disputes, and her
       actions regarding issues at E.'s school. The record reveals extensive cross-

10     examination of McGuire and vigorous criticism of her methods, analysis, and
       conclusions in closing argument. Again, Giles fails to demonstrate any constitutional

11     deficiency.

12 (*Id.*, Ex. 30 at 5.)

13      As found by the state court, the record supports the sufficiency of petitioner's counsel's

14 performance as it related to the cross-examination of McGuire. (*See* Dkt. 52, Ex. 52 at 32-119,

15 140 and Ex. 59 at 182-84.) In fact, contrary to petitioner's contention, his counsel did question

16 McGuire regarding his daughter's behavior during questioning as to abuse and her behavior

17 generally. (*See id.*, Ex. 52 at 51-64.) Otherwise, as with Nathe, petitioner attacks his counsel's

18 tactical decisions in the line of questioning pursued with McGuire and fails to demonstrate that his

19 counsel's performance was not objectively reasonable.

20      5.    <u>Cross-Examination of Rhinee Yeung</u>:

21      Petitioner asserts his counsel's ineffectiveness in the failure to challenge the testimony of

22 his ex-wife, Rhinee Yeung. He points to numerous specific instances in which his counsel failed

REPORT AND RECOMMENDATION
PAGE -19

01  to impeach Yeung's testimony and the failure to call various impeachment witnesses. (*See* Dkt.

02  1 at 9-15 and Dkt. 32 at 28-31.) Pointing to the State's response to this argument (Dkt. 22, Ex.

03  28 at 16-21) and the ruling of the Washington Court of Appeals (*id.*, Ex. 30 at 3-7), respondent

04  argues that the state court reasonably denied this claim.

05       In considering petitioner's challenges to the cross-examination of Yeung, the Washington

06  Court of Appeals described a number of petitioner's specific arguments and found as follows:

07       . . . Giles claims that counsel's failure to challenge Yeung's testimony
         amounted to deficient performance. In particular, he contends his attorney should

08       have (1) challenged Yeung's account of an alleged incident of domestic violence three
         years before the matters at issue in the charge with evidence from her journal, her

09       prior declaration and her phyciatrists' [sic] records; (2) impeached Yeung's
         testimony regarding her decision to retain a divorce attorney immediately following

10       that incident with evidence of what she told Giles; (3) questioned Yeung about her
         boast to Giles that she had gone to various medical clinics and called women's

11       shelters to create evidence against him; (4) impeached Yeung with the details of
         Giles's child support payment history; (5) cross-examined Yeung about her mental

12       health issues, her abuse of the children, and her attempts to lie about or discredit
         Giles; and (6) called witnesses to testify that Giles had expressed fear that Yeung

13       would attempt to bring false charges against him, that Yeung had lied on various
         occasions, that Yeung violated their parenting plan, and that Yeung manipulated

14       various professionals. Regarding each matter listed, the record reveals that defense
         counsel either followed the trial court's evidentiary rulings or made tactical decisions

15       to attack the State's case or present relevant evidence in a manner different than what
         Giles would have apparently preferred.

16
                    . . .

17
                    . . . Giles complains that defense counsel failed to introduce evidence of

18       Yeung's medical records showing a history of mental illness to impeach Yeung and
         discredit the State's case. But on direct appeal, the court affirmed the trial court's

19       decision to exclude certain evidence of Yeung's mental health. Moreover, an
         examination of the entire record reveals that despite Giles's obvious desire to have the

20       defense case focus on Yeung's mental health and alleged manipulation of E. and
         others, his attorney chose a different strategy, highlighting the discrepancies in witness

21       testimony, the troubling aspects of the numerous interviews with E., and the
         circumstances suggesting that E. was pressured into making a false report against her

22       father. On this record, Giles fails to demonstrate deficient performance.

REPORT AND RECOMMENDATION
PAGE -20

01      . . .

02

03      Next, Giles claims that defense counsel's failure to call character witnesses to testify for him constituted ineffective assistance.  But the defense case included a home video showing Giles with his children and John Aakre's testimony of his observations of Giles's parenting.  Because character for truthfulness is not relevant to the charges, Giles fails to establish deficient performance.

04

05

06 (Dkt. 22, Ex. 30 at 3-7; footnote omitted.)

07      A review of the record reveals an extensive cross-examination of Yeung by petitioner's

08 counsel.  (*See* Dkt. 52, Ex. 50 at 27-70 and Ex. 59 at 124-25.)  As with the witnesses discussed

09 above, petitioner attacks his counsel's tactical decisions in the lines of questioning pursued with

10 Yeung and fails to demonstrate that his counsel's performance was not objectively reasonable.

11      Nor does petitioner demonstrate that his counsel's failure to call a variety of different

12 impeachment witnesses rendered the assistance ineffective.  As reflected in the state court's

13 decision, to the extent the witnesses would have attested to petitioner's relationship with his

14 children, the evidence would have been duplicative of other evidence offered at trial, including

15 the home video and the testimony from John Aakre.  (*See id.*, Ex. 49 at 87–101 and Ex. 56 at 98-

16 106, 121-22.)  Also, to the extent the witnesses would have offered testimony critical of Yeung,

17 it is apparent that petitioner's counsel opted to take a different tactical approach.  Petitioner fails

18 to demonstrate that this approach, or any other aspect of his counsel's cross-examination of

19 Yeung, fell below an objective standard of reasonableness.

20      6.   <u>Striking Jurors</u>:

21      Petitioner asserts that three jurors (juror numbers 3, 62 and 63) expressly admitted bias

22 in a jury questionnaire in response to a question as to whether or not they could be fair.  He

REPORT AND RECOMMENDATION
PAGE -21

01  focuses on juror number 3 as later continuing to express her prejudice.  Petitioner argues that the

02  failure to strike these three admittedly biased jurors deprived him of his right to counsel.

03          Respondent argues that petitioner fails to show that the three jurors were biased.  He

04  further points to the ruling of the Washington Court of Appeals:

05          One of the juror he identifies was, in fact, excused.  As for the other jurors, although
        some admitted to having strong feelings about child abuse, they all indicated that they
06          could be objective and fair and defense trial counsel did not exercise a challenge for
        cause as to any of these jurors.  See State v. Brett, 126 Wn.2d 136, 158, 892 P.2d 29
07          (1995) (a trial court need not excuse a juror who indicates that he can be fair, set
        aside preconceived ideas, and decide a case based on the evidence).

08

09  (Dkt. 22, Ex. 2 at 22.)

10          A criminal defendant has a right to a trial before "a panel of impartial, 'indifferent' jurors."

11  *Irvin v. Dowd*, 366 U.S. 717, 721-22 (1961).  Actual or implied juror bias may be grounds for

12  reversal.  *United States v. Martinez-Martinez*, 369 F.3d 1076 , 1081 (9th Cir. 2004).

13  Petitioner argues the existence of actual juror bias – meaning  "bias in fact -- the existence of a

14  state of mind that leads to an inference that the person will not act with entire impartiality." *Fields*

15  *v. Brown*, 503 F.3d 755, 767 (9th Cir.2007) (quoted sources and internal quotation marks

16  omitted). "Actual bias is typically found when a prospective juror states that he can not be

17  impartial, or expresses a view adverse to one party's position and responds equivocally as to

18  whether he could be fair and impartial despite that view." *Id*.  He also asserts, without significant

19  discussion, implied juror bias, which exists in "those extreme situations where the relationship

20  between a prospective juror and some aspect of the litigation is such that it is highly unlikely that

21  the average person could remain impartial" or where there is the "potential for substantial

22  emotional involvement, adversely affecting impartiality." *Tinsley v. Borg*, 895 F.2d 520, 527 (9th

REPORT AND RECOMMENDATION
PAGE -22

01 | Cir. 1990) (internal quotation marks and citations omitted).

02 |      As argued by respondent, petitioner fails to support his contention that the jurors in

03 | question were, in fact, biased. [1]  For example, juror number 3, while acknowledging her initial

04 | response on the jury questionnaire, stated that she would be "hyper vigilant to be fair and to look

05 | at everything very clearly and with an open mind." (Dkt. 52, Ex. 45 at 31-34.)  When further

06 | questioned by petitioner's counsel, she clarified:  "Certainly my gut reaction is I would have

07 | difficulty being fair.  But as the day progressed, I do know that my sense of fairness and listening

08 | to all parties involved overrides my strong feelings about anything basically.  I am very committed

09 | to keeping an open mind, open ear, and also listening to the evidence." ( *Id.*, Ex. 46 at 27-29.)

10 | Similarly, the other two jurors at issue – juror numbers 62 and 63 – expressed their ability to be

11 | fair upon questioning by petitioner's counsel. (Dkt. 52, Ex. 46 at 38-41, 44.)  In fact, one of those

12 | jurors expressed her belief that she may have mistakenly answered the questionnaire.  (*Id.* at 44.)

13 | Nor is there any basis for finding the existence of implied bias on the part of these jurors.

14 |      Given the above, petitioner fails to establish that his counsel's failure to strike the jurors

15 | in question was objectively unreasonable. *See*, *e.g.*, *Denham v. Deeds*, 954 F.2d 1501, 1505 (9th

16 | Cir. 1992) (finding insufficient evidence to conclude that the failure to challenge a juror amounted

17 | to ineffective assistance of counsel where, *inter alia*, "the juror satisfied the judge of her

18 | impartiality when she assured him that she could base her verdict on the evidence alone with no

19 | prejudice," and it was "quite possible that appellant's counsel's failure to challenge the juror may

20 | have in some way been a tactical decision.")  Instead, his decisions regarding jury selection may

21 | ————————————

22 |     [1] It should be noted that it does appear that all three jurors in question in this particular argument were seated on the jury.

REPORT AND RECOMMENDATION
PAGE -23

01   be deemed reasonable tactical decisions under the circumstances.  *See id*.

02          7.     Failure to Object to Rebuttal Testimony:

03         Petitioner argues that his counsel was ineffective in failing to object to testimony from

04   Lucy Berliner rebutting the testimony of defense expert witness Dr. John Yuille.  He asserts

05   Berliner's absence of knowledge as to the facts in the case, that the State used Berliner to

06   introduce otherwise inadmissible evidence, and that her testimony was cumulative and inadmissible

07   in that its prejudicial value outweighed its probative value.

08         Respondent relies on the arguments raised by the State in response to petitioner's personal

09   restraint petition:

10         Giles misunderstands the nature of the testimony at issue.  Tona McGuire was
    called by the State as a fact witness to E.'s disclosures of sexual abuse.  Dr. Yuille
11   was called by the defense as an expert witness on child interview techniques,
    specifically to comment upon the interviews conducted in this case.  The State then
12   called Lucy Berliner, the director of the Harborview Center for Sexual Assault and
    Traumatic Stress, as an expert witness to rebut Yuille's testimony about the interview
13   techniques used in this case.  Berliner specifically rebutted Yuille's assertions that
    child interviews should be videotaped; his allegation that Tona McGuire was
14   improperly acting as both a therapist and an investigator; and his categorical opinion
    that, at least for investigative purposes, a child who may have been abused should
15   never be interviewed a second time if she does not disclose abuse in the initial
    interview.

16

17         Giles further complains that Berliner relied on inadmissible and "tainted"
    documents.  He seizes upon Berliner's listing of the materials sent to her by the
18   prosecutor as including "some reports prepared by a psychiatrist and psychologists
    related to Mr. Giles", and launches into speculation as to which specific reports
    Berliner saw, and whether they contained inadmissible evidence.  Again, Giles does
19   not understand the scope of allowable expert testimony.  "The facts of data in the
    particular case upon which an expert bases an opinion or inference may be those
20   perceived by or made known to the expert at or before the hearing.  If of a type
    reasonably relied upon by experts in the particular field in forming opinions or
21   inferences upon the subject, the facts or data need not be admissible in evidence."
    [Evidence Rule] 703.

22

01       Because the testimony of Lucy Berliner as a rebuttal witness was entirely
02   proper, Giles's attorney was not ineffective in failing to object to it.

03   (*Id.*, Ex. 28 at 28-30; internal citations omitted.)  He argues that the Washington Court of Appeals

04   correctly ruled on this issue.

05       The Court agrees with respondent.  The Washington Court of Appeals considered and

06   ruled on this issue as follows:

07       In his eighth ground, Giles contends that his attorney's failure to object to
08   Lucy Berliner's testimony constituted deficient performance because (1) her testimony
     was cumulative, (2) she mentioned reviewing reports about Giles that he claims were
     "tainted" and prejudiced the jury, and (3) the State improperly used her testimony
09   simply to boost [Kerry Todd's [(a social worker who evaluated petitioner's
     children)] credibility and she was not qualified to do so because she was not able to
10   read Todd's notes.  The State called Berliner, Director of the Harborview Center for
     Sexual Assault and Traumatic Distress, as a rebuttal witness to respond to defense
11   expert John Yuille's criticisms of the process leading to E.'s reports, including the
     interviews by McGuire and Todd.  Berliner's testimony was not cumulative, in that
12   no other qualified expert witness commented on Yuille's analysis or conclusions.
     Berliner did not mention the contents of the allegedly "tainted" reports or testify to
13   any opinions regarding Giles.  Because there was nothing improper about Berliner's
     testimony regarding her opinions about the methods employed by McGuire and Todd
14   or her responses to Yuille's criticisms, Giles fails to establish deficient performance
     based on the lack of objection.
15

16   (Dkt. 22, Ex. 30 at 6.)  Petitioner fails to show his counsel's performance with respect to Berliner

17   fell below an objective standard of reasonableness or to otherwise establish that the state court's

18   decision was contrary to federal law.  Instead, a review of the record contradicts petitioner's

19   allegations. (*See* Dkt. 52, Ex. 59 at 126-73.)

20       8.    Failure to Call Witnesses and Present Character Testimony:

21       In addition to the argument raised with respect to Yeung, petitioner separately argues the

22   ineffectiveness of his trial counsel in failing to present additional character witnesses and

REPORT AND RECOMMENDATION
PAGE -25

01 testimony. He contends that his counsel ignored the opportunity to present testimony as to his

02 good character and truthfulness despite the fact that the trial court opened the door to its

03 presentation. Respondent rejects this contention, noting the Washington Court of Appeals' finding

04 that petitioner had already presented evidence of his relationship with his children and that

05 character for truthfulness was not relevant to the charges. (Dkt. 22, Ex. 30 at 6-7.)

06      Again, petitioner fails to demonstrate the deficiency of his trial counsel's performance. As

07 noted by the Washington Court of Appeals, petitioner's counsel did present character evidence

08 in his favor, including a home video of his interactions with his children and the testimony of his

09 close friend John Aakre. ( *See* Dkt. 52, Ex. 49 at 87–101 and Ex. 56 at 98-106, 121-22.)

10 Petitioner fails to show that his counsel's decision to not present additional character evidence was

11 not objectively reasonable or that it actually prejudiced his case. The Court further notes that, to

12 the extent petitioner raises arguments as to testimony specific to the issue of his truthfulness, the

13 cases on point reflect state, not federal law.

14      In sum, this argument, as with the arguments addressed above, does not establish that

15 petitioner received constitutionally deficient assistance from his trial counsel. Petitioner fails to

16 demonstrate in his first ground for relief that he is in custody in violation of federal law or that the

17 state court's decisions were contrary to, or involved an unreasonable application of, clearly

18 established federal law.

19 B.    Ground Two

20      In his second ground for relief, petitioner argues that he was prejudiced in being denied

21 the right to be present when the home video he introduced into evidence was replayed for the jury.

22 In considering this issue, the Washington Court of Appeals ruled as follows:

REPORT AND RECOMMENDATION
PAGE -26

01    At trial, Giles introduced a videotape showing him interacting with his
02 daughter at various times between December 1995 and December 1996.  At Giles's
   request, the exhibit was admitted into evidence without redaction.  During
03 deliberations, the jury asked to have the videotape exhibit played again.  The court
   instructed the bailiff to obtain equipment and play the tape for the jury. [Because of
   the size of the television, the equipment could not be brought into the jury room, so
04 the bailiff played the tape once for the jury in the locked courtroom.] The court did
   not notify the parties or counsel about the jury's request or the court's response.

05    Giles moved for a mistrial, on the ground that the court engaged in improper
06 ex parte communication with the jury.  The court denied the motion, concluding there
   was no improper communication between the court and the jury. [In its ruling, the
07 court also indicated that before deliberations, counsel and the court had discussed the
   procedure for showing the tape and the court told counsel that the first time the jury
   asked, the tape would be played once without stopping, without notification.
08 Apparently defense counsel took the position at that time that the defendant and
09 counsel had a right to be present.]

10    On appeal, Giles argues that his conviction should be reversed because the
   court replayed his videotape exhibit without notice to him and outside of his presence.
11 He contends that he was prejudiced because no third party was present other than the
   court's bailiff and the jury.  He also argues that replaying the tape was prejudicial
12 because the State had urged the jury not be persuaded by it because it was a self-
   serving exhibit created by Giles.

13
14    As a general rule, a trial court should not communicate with the jury in the
   absence of the defendant.  State v. Bourgeois, 133 Wn.2d 389, 407, 945 P.2d 1120
15 (1997).  The same rule applies to contact between the bailiff and jury because the
   bailiff is considered the "alter-ego" of the trial judge.  Bourgeois, 133 Wn.2d at 407.
16 But improper communication may be so inconsequential, it is harmless error.
   Bourgeois, 133 Wn.2d at 407.  Although the State bears the burden to show the
17 communication is harmless beyond a reasonable doubt, the defendant must first raise
   at least the possibility of prejudice.  Bourgeois, 133 Wn.2d at 407; State v. Caliguri,
   99 Wn.2d 501, 509, 664 P.2d 466 (1983).

18
19    It was error to replay the videotape exhibit without notice to the parties or
   counsel and outside the presence of Giles.  See Caliguri, 99 Wn.2d at 508-09 (the trial
20 court erred in replaying videotape exhibits without notice to the defendant and outside
   the defendant's presence, but the error was harmless even though the tape replayed
   for the jury included portions which had been excluded at trial.)  But Giles has not
21 raised the possibility of prejudice caused by the error. [Additional authority cited by
   appellate counsel and by Giles does not establish that replaying a videotape exhibit
22 cannot be harmless error.  See, e.g., Fisher v. Roe, 263 F.3d 906 (9th Cir. 2001)

REPORT AND RECOMMENDATION
PAGE -27

01  (pertaining to replaying trial testimony, not an exhibit); U.S. v. Kapau, 781 F.2d 740
    (9th Cir. 1986) (error in replaying taped exhibits outside the presence of counsel and
02  the defendant was harmless).] The exhibit replayed for the jury was introduced into
    evidence by Giles. Giles cannot establish prejudice from the single replaying of the
03  tape he admitted into evidence at trial. [There is no allegation that any communication
    occurred between the bailiff and the jury when the videotape was played.]

04

05  (Dkt. 22, Ex. 3 at 17-18; text from footnotes bracketed.)  Later, in considering an associated

06  ineffective assistance of counsel claim, the Washington Court of Appeals stated: "Here, Giles

07  argues that the fact that the prosecutor was present for the replay when he was not is prejudicial

08  per se or that a reference hearing is required to determine whether anything prejudicial occurred

09  when he was out of the court room.  But his self-serving speculation does not demonstrate a basis

10  for relief or a reference hearing."  (Id., Ex. 30 at 7; footnote omitted.)

11      Petitioner argues that his exclusion from the replay of the video cannot be considered

12  harmless.  He notes the absence of a court reporter to allow for consideration of what occurred.

13  He asserts that the prosecutor set up the video and was present during the initial portion of the

14  playback and that his own presence may have "counter-balanced" the prosecutor's mis-

15  characterization of the video evidence during closing remarks.  (Dkt. 32 at 44.)  Petitioner also

16  takes note of the bailiff's presence during the replay and asserts the bailiff's "open hostility" to him

17  and his family throughout the trial.  (Id.)  Among other issues (see id. at 45-46), he avers that the

18  state court inappropriately put the burden on him to prove prejudice.

19      "A defendant has a right to be present at any critical stage of his criminal proceedings if

20  his presence would contribute to the fairness of the procedure."  Campbell v. Rice, 408 F.3d 1166,

21  1171 (9th Cir. 2005) (citing Kentucky v. Stincer, 482 U.S. 730, 745 (1987) and United States v.

22  Gagnon, 470 U.S. 522, 527 (1985)).  Contrary to petitioner's contention, exclusion from a critical

REPORT AND RECOMMENDATION
PAGE -28

01  stage of the proceedings is a trial error subject to the harmless error analysis. *Campbell*, 408 F.3d

02  at 1172; *Fisher v. Roe*, 263 F.3d 906, 917 (9th Cir. 2001), *overruled on other grounds by Payton*

03  *v. Woodford*, 346 F.3d 1204 (9th Cir. 2003).[2]

04          A trial error "is deemed harmless unless it has a 'substantial and injurious effect or

05  influence in determining the jury's verdict.'" *Rice v. Wood*, 77 F.3d 1138, 1144 (9th Cir. 1996)

06  (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).  The Court defers to the state court

07  determination that the an error did not cause prejudice unless the state court decision on prejudice

08  was contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. §

09  2254(d); *Inthavong v. Lamarque*, 420 F.3d 1055, 1058-59 (9th Cir. 2005).  If the Court were to

10  determine that the state court decision was either an unreasonable application of or contrary to

11  Supreme Court precedent, it still must assess whether the error had a substantial and injurious

12  effect on the verdict. *Inthavong*, 420 F.3d at 1059.  Under this standard, the Court may not grant

13  habeas relief unless the petitioner suffered actual prejudice from the constitutional error. *Brecht*,

14  507 U.S. at 637.

15          In this case, the Court concludes that the state court decision on prejudice was not

16

17          [2] Because the Court is able to resolve this ground for relief by focusing on the issue of

18  prejudice, it assumes without deciding that petitioner's exclusion from the replay of the video was
    an error of constitutional significance. *Compare La Crosse v. Kernan*, 244 F.3d 702, 708 (9th Cir.
    2001) (stating that the United States Supreme Court has never addressed whether the "readback

19  of testimony to a jury" is a critical stage for which a defendant has a right to be present, nor
    "considered any case with 'materially indistinguishable facts.'"), *with Fisher*, 263 F.3d at 916-17

20  (finding a "problem of constitutional substance[]" where, in contrast to *La Cross*, the readback
    of testimony "occurred not only in the absence of the defendants and their lawyers, but without

21  their knowledge and participation. In short, they had been completely and unilaterally excluded
    from that part of the trial."; noting previous cases in which the Ninth Circuit Court of Appeals has

22  held that a defendant has a constitutional right to be present at a readback).

REPORT AND RECOMMENDATION
PAGE -29

01  contrary to or an unreasonable application of federal law, and that there is no basis for concluding

02  that petitioner's absence during the video playback had a substantial and injurious effect on the

03  verdict.  There is no suggestion in the record of untoward circumstances surrounding the video

04  playback; as explained by the trial judge:

05           Most of the discussion that was had concerning how the video would be
         handled in the jury room was done outside the presence of the jury, and I don't even
06       think on record.  We had a sidebar when it went back.  I told both counsel that it was
         this Court's practice that when there was an audio tape or videotape that was
07       admitted into evidence, I would not send back a TV or recording device for the jury
         to play the video or the audio, because of my concerns that they might somehow
08       manipulate it.  I also told counsel that it was this Court's practice that when a request
         was made, the first request, I would not notify counsel, that the bailiff would be given
09       the responsibility of playing the tape through – be it audio or video, playing it through
         once without stopping so that the jury could see it.  It was this Court's statement to
10       counsel that that is part of their deliberation.  In this courtroom that deliberation does
         not occur either in the presence of counsel or in the presence of the Court.  Once the
11       request had been made my bailiff in fact did show the video to the jury.  Normally it
         would be done back in the deliberation room.  In this case I understand she actually
12       did it in the courtroom, because the TV is so large it was not appropriate to try to get
         it back into the jury room.  So instead of using the jury room she used the courtroom.
13       She and the jury were the only ones present.  And she locked the courtroom up during
         the showing so that the courtroom was in fact at that point the jury deliberation room.
14       . . .  I was not present.  And it is readily accepted during deliberations the bailiff is
         permitted to go back and respond to jurors' requests, including requests for
15       equipment so they can view evidence.

16  (Dkt. 52, Ex. 61 at 3-4.)   Petitioner offers no more than bare allegations both as to the

17  prosecutor's presence for a portion of the video playback and the bailiff's purported hostility, and

18  merely speculates as to the possibility of improper statements or conduct during the playback.[3]

19

20       [3] The fact that this case involves the playback of a video exhibit in its entirety distinguishes
    it from cases involving the reading of testimony.  *See, e.g.*, *Fisher*, 263 F.3d at 918 (noting that
21  it was unknown what testimony was involved and that the record did "not shed any light on
    whether the court reporter unduly emphasized any particular testimony, either by failing to read
22  cross examination or through improper voice inflections.")

REPORT AND RECOMMENDATION
PAGE -30

01       Further, as stressed by the state court, the exhibit in question was admitted into evidence

02  by petitioner in order to support his defense.  Although the prosecutor did criticize the exhibit

03  during his closing remarks (*id.*, Ex. 60 at 45-51), this was not an instance of unfavorable evidence

04  being shown to the jury outside of petitioner's presence.  Instead, presumably, petitioner wanted

05  the jury to consider this exhibit during their deliberations.

06       In sum, the Court finds no basis for concluding that petitioner suffered actual prejudice as

07  a result of his exclusion from the playback of the video.  *See, e.g.*, *United States v. Kupau*, 781

08  F.2d 740, 743 (9th Cir. 1986) ("In this case, given the court's emphatic cautionary instructions,

09  the obvious efforts of the court, by clearing the courtroom, to prevent any outside influences, and

10  the absence of any suggestion that extraneous matters came before the jury, we similarly hold that

11  the error [in replaying taped evidence] was harmless beyond a reasonable doubt.")  Petitioner's

12  second ground for relief lacks merit and should be denied.

13  C.    <u>Ground Three</u>

14       Petitioner argues in his third ground for relief that a twenty-one month delay between the

15  time of accusation and the filing of charges in this case deprived him of his right to due process.

16  He claims that the state only charged him following his attempt to recover custody of his children.

17  Petitioner asserts harm to his reputation and finances during the delay, as well as the loss of

18  various witnesses and the effect on the testimony of his children.  He also avers his trial counsel's

19  incompetency in failing to pursue this issue prior to trial.

20       The Washington Court of Appeals ruled on this claim as follows:

21       . . . Giles argues that the State delayed prosecution to gain a tactical advantage
       over him and that defense counsel's failure to seek dismissal based on prosecutorial

22       delay demonstrates his ineffective assistance.  Giles contends he was prejudiced by the

REPORT AND RECOMMENDATION
PAGE -31

01     delay because he used all his money and eventually had to rely on a public defender
02     and because various witnesses were "soured" by the delay or had moved away by the
    time of trial.  He contends he was prejudiced because the State could not prove that
03     the delay was justified.  But the record includes letters written shortly after E.'s
    allegations came to light in 1997 from Giles's former attorney to the State, urging the
    prosecutor to delay filing charges and defer to the family court.  Bare assertions and
04     conclusory allegations to the contrary do not justify relief here.

05 (Dkt. 22, Ex. 30 at 5-6.)  Respondent argues that petitioner fails to show a constitutional violation

06 in this ground for relief.  For the reasons described below, the Court agrees with respondent.

07       The Due Process Clause protects against "oppressive" pre-indictment delay.  *United States*

08 *v. Lovasco*, 431 U.S. 783, 788 (1977).  Establishing a denial of due process through pre-

09 indictment delay requires: (1) proof of actual, non-speculative prejudice from the delay; and (2)

10 a showing that the delay, when balanced against the reason for the delay, offends those

11 "'fundamental conceptions of justice which lie at the base of our civil and political institutions.'"

12 *United States v. Sherlock*, 962 F.2d 1349, 1353-54 (9th Cir. 1992) (quoting *Lovasco*, 431 U.S.

13 at 790).  With respect to the latter point, the United States Supreme Court has held that "to

14 prosecute a defendant following investigative delay does not deprive him of due process, even if

15 his defense might have been somewhat prejudiced by the lapse of time."  *Lovasco*, 431 U.S. at

16 796.  However, without a demonstration of actual prejudice, the reasons for the delay need not

17 be considered.  *See United States v. Ross*, 123 F.3d 1181, 1186-87 (9th Cir. 1997).

18       Petitioner fails to demonstrate actual, non-speculative prejudice resulting from the pre-

19 indictment delay.  For example, petitioner claims that the testimony of his children was

20 compromised by the delay, but the examples given do not demonstrate any effect on the essential

21 aspects of their testimony.  A petitioner must do more than assert that "witnesses' memories may

22 have faded with the passage of time."  *Prantil v. California*, 843 F.2d 314, 318 (9th Cir. 1988).

REPORT AND RECOMMENDATION
PAGE -32

01   Nor is it enough to assert that testimony was lost if the expected content of the testimony was

02   generally speculative and cumulative.  *See Ross*, 123 F.3d at 1186.  Here, petitioner asserts the

03   lost supportive testimony of two of his daughter's former teachers, but declines to identify any

04   specific content of such testimony as to the criminal charges brought against him or to

05   demonstrate that any testimony of these witnesses would not have been cumulative of, for

06   example, the testimony of John Aakre.  Finally, his assertions as to the harm to his reputation and

07   finances and the incompetency of his trial counsel in relation to this issue are no more than

08   conclusory.

09          Nor does petitioner support the contention that the delay was unduly oppressive and

10   outweighed the prosecutor's reasons for not filing charges against petitioner earlier.  Petitioner

11   asserts that the investigation into the May 1997 accusation against him "was completed within a

12   couple of months." (Dkt. 32 at 46.)  However, this assertion is contradicted by documents within

13   the record reflecting an ongoing investigation in as late as September 1998.  (*See* Dkt. 52, Ex. 28,

14   Appx. E (letters from petitioner's criminal attorney to prosecutor).)  Those documents also

15   support the state court's finding that petitioner and his criminal attorney sought delay in any

16   prosecution pending the completion of petitioner's family court matter.  (*See id*. (November 27,

17   1997 letter from petitioner's criminal attorney to the prosecutor stating: "I appreciate your

18   patience and caution in coming to a filing decision regarding Mr. Giles."; and September 22, 1998

19   letter from petitioner to his criminal attorney in which he expressed his agreement with the effort

20   to request that the prosecutor "defer to the family law arena[.]"))

21          Given the above, petitioner fails to establish that he was denied due process through

22   pre-indictment delay.  His third ground for relief lacks merit and should be denied.

REPORT AND RECOMMENDATION
PAGE -33

01   D.      Ground Four

02          In his fourth ground for relief, petitioner argues that restrictions on cross-examination

03   during the trial were so severe as to make witnesses unavailable, violating his rights to

04   confrontation and to present a defense.   He challenges the trial judge's decision to exclude

05   evidence of Yeung's journal entries and fictional writings, and evidence of evaluator Kerry Todd's

06   alleged history of contriving false accusations of sexual abuse.   For the reasons described below,

07   the Court agrees with respondent that this argument fails.

08          While defendants have a right under the Confrontation Clause of the Sixth Amendment to

09   confront witnesses who testify against them, trial judges retain wide latitude "to impose reasonable

10   limits on such cross-examination based on concerns about, among other things, harassment,

11   prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only

12   marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).   Factors relevant to a

13   determination of whether a defendant's confrontation clause right to cross examination was

14   violated include: "'(1) [whether] the excluded evidence was relevant; (2) [whether] there were

15   other legitimate interests outweighing the defendant's interest in presenting the evidence; and (3)

16   [whether] the exclusion of evidence left the jury with sufficient information to assess the credibility

17   of the witness.'"  *United States v. Larson*, 495 F.3d 1095, 1103 (9th Cir. 2007) (quoted and cited

18   sources omitted).   If evidence is not relevant, its exclusion does not violate the constitution. *Wood

19   v. Alaska*, 957 F.2d 1544, 1549-50 (9th Cir. 1992).   Moreover, the Court is unlikely to find a

20   Sixth Amendment violation where substantial cross-examination has occurred, and the excluded

21   cross-examination concerned a collateral matter.  *See Bright v. Price*, 819 F.2d 227, 229 (9th Cir.

22   1987).

REPORT AND RECOMMENDATION
PAGE -34

In this case, the Washington Court of Appeals addressed petitioner's arguments with respect to Yeung and Todd as follows:

> In the first trial, Giles argued that he should be allowed to introduce evidence supporting his theory that Yeung "was instrumental in creating false allegations" against him. He sought to introduce a domestic violence accusation made by Yeung to the police and her recantation. He also wanted to argue that Yeung influenced E. because Yeung knew about Giles's conversations with Harris before E.'s disclosures. Giles did not seek to introduce Yeung's journal entries and fictional writings.

> The court limited the scope of cross examination:

> The issue is the divorce was acrimonious. That much can come out. Just like a lot of divorces, they still don't like each other. That is sufficient to impeach. And the fact that on a prior occasion she had attempted to have him prosecuted for something and then recanted. That's it, period. And then all these other things about did she watch TV shows and all the prior bad acts that went on in the marriage, we are not going to go through that because we are not going to retry the dissolution.

> In the second trial, the trial court entered an order on pretrial motions and motions in limine restating the decisions from the first trial. The order again limited the scope of Yeung's cross examination and reiterated:

> Dr. Yeung may be cross-examined regarding the fact that her divorce from the defendant was acrimonious. Dr. Yeung may be questioned regarding the fact that she made a prior claim of domestic violence against the defendant, which she subsequently recanted. If this issue is raised, evidence that the domestic violence accusation was true also may be offered. No further questioning on this issue will be permitted. In addition, there shall be no questions regarding other claimed prior misconduct or bad acts on the part of Dr. Yeung.

> Giles testified in the second trial. During his direct examination, he said Yeung was behind the accusations made by Harris and his daughter. His belief was based on journal entries and fictional writings he found when Yeung moved out in which Yeung wrote about "needing to kill the family." The State objected when defense counsel asked Giles about the content of the writings. The court sustained the objection, ending the inquiry. Giles then testified that he had "run into" Yeung on the Nightline Services chat line. [The testimony did not establish any connection between Harris and Yeung. According to Giles, people could only talk to members of the opposite sex on the chatline.] He said that Yeung did not identify herself by name on the chat line, but he recognized her voice. [In her testimony, Yeung denied

01     that she ever called the chat line.]

02     On cross examination, Giles said he was the victim of a conspiracy. The State asked who was involved in the conspiracy and Giles identified Yeung, Yeung's sister,
03 her brother-in-law, McGuire, William Nathe, Harris, and Stackhouse. But Giles admitted there was no evidence of a connection between Harris or Stackhouse and
04 Yeung.

05     Giles then argued that his testimony about the contents of Yeung's fictional and autobiographical writings was admissible to support his belief that Yeung
06 influenced E. to accuse him of sexual abuse. He believed there were striking similarities between Yeung's description of her childhood events and events related
07 to his children, E. and D. In his offer of proof, Giles also argued that because the State had called attention to the lack of evidence to support this theory, he was
08 entitled to introduce whatever evidence he believed supported it.

09     The court found that there was no correlation between Yeung's fictional and autobiographical writings and journal entries and the admissions reported by Harris
10 and E.'s subsequent disclosures. The court excluded this evidence as irrelevant, speculative, and prejudicial. [The court also pointed out that ruling in Giles's favor
11 would mean, "in a case where a father/husband is accused of a sexual offense, . . . he ought to be able to get in all of these alleged sexual offenses committed in the
12 spouse's childhood on the theory that that would have prompted this spouse to set him up with the same kind of thing".]

13

14     An accused has a constitutional right to present evidence in his or her defense. State v. Rehak, 67 Wn. App. 157, 162, 834 P.2d 651 (1992). But that right is not
15 absolute and it does not guarantee the right to present irrelevant or inadmissible evidence. State v. Maupin, 128 Wn.2d 918, 924-25, 913 P.2d 808 (1996). The
16 exclusion of evidence lies within the sound discretion of the trial court and its decision will not be reversed absent an abuse of discretion. State v. C.J., 148 Wn.2d 672, 686,
17 63 P.3d 765 (2003); State v. Darden, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002). "A trial court abuses its discretion only when its decision is manifestly unreasonable or
18 is based on untenable reasons or other grounds." C.J., 148 Wn.2d at 686.

19     Giles relies on State v. Quigg, 72 Wn. App. 828, 839, 866 P.2d 655 (1994), to support his argument that the trial court abused its discretion in excluding his
20 testimony about Yeung's writings.

21     The writings that Giles wanted to testify about consisted of stories, journal entries, and notes. [Also included were lists of assets and notes for a will. One story
22 is typed, the other writings are handwritten. Some are illegible and five were transcribed by Giles. Only the lists of assets, notes for a will and one other document

REPORT AND RECOMMENDATION
PAGE -36

01    are dated.] For example, one story is about two small children opening a medicine
cabinet against their mother's instructions and consuming pills thinking they are

02    candy. In another story, the narrator describes an incident of attempted molestation
by a distant relative which occurred when the narrator was twelve or thirteen. The

03    narrator describes being "saved" when the parents returned home unexpectedly. One
journal entry describes a dream Yeung had about the death of her first husband.

04

05          In <u>Quigg</u>, the court upheld the admission of a fictional story written by the
defendant because it was "essentially a blueprint" of the crime. But unlike <u>Quigg</u>,

06    none of the writings Giles sought to testify about parallel the allegations made by E.
or suggest that Yeung used her daughter to recreate her own experiences or desires.

07    Nor do any of the writings describe false accusations against someone.

08          Because Giles testified that Yeung was behind a conspiracy to falsely accuse
him, the State was entitled to ask him questions about the conspiracy. <u>See Johnson</u>

09    <u>v. Carbon</u>, 63 Wn. App. 294, 299, 818 P.2d 603 (1991) (a party is entitled to cross
examine a witness within the scope of direct). The questions asked by the State on

10    cross examination did not allow Giles to testify about Yeung's irrelevant writings.

11          The trial court correctly excluded Gile's testimony about Yeung's writings.
Even if Giles could show that Yeung's writings were autobiographical, they do not

12    show a conspiracy and are not related to Harris's or E.'s allegations. And although
Giles sought to testify about the content of the writings to show Yeung's role in

13    falsely accusing him, there is nothing in the writings suggesting such a plan. The trial
court did not abuse its discretion by excluding the testimony.

14          . . .

15          Prior to both trials, Giles sought to admit evidence that the ESSAC evaluator
[(Todd)] accused her former spouse of sexually abusing their young daughter during

16    their dissolution ten years earlier. [According to Giles, the ESSAC evaluator's child
was "inappropriately subjected" to numerous gynecological exams until the evaluator

17    was prohibited from obtaining further exams without consent of the father. . . . The
only evidence of this is a declaration of Giles's counsel. . . .] Giles argued that this

18    evidence demonstrated the evaluator's "zealousness" in pursuing allegations of sexual
abuse and supported his theory that she induced E. to say that Giles abused her. He

19    contends the court abused its discretion in excluding this evidence.

20          Cross examination of a witness to show bias, prejudice, or interest is a matter
of right, but the scope of such cross examination rests within the sound discretion of

21    the trial court. <u>State v. Swanson</u>, 16 Wn. App. 179, 194, 554 P.2d 364 (1976). It is
within a trial court's discretion to refuse to allow cross examination that will "only

22    remotely tend to show bias or prejudice of the witness, where the evidence is vague,

01    or where the evidence is merely argumentative and speculative." <u>State v. Roberts</u>, 25
Wn. App. 830, 834, 611 P.2d 1297 (1980); <u>State v. Kilgore</u>, 107 Wn. App. 160, 185,
02    26 P.3d 308 (2001), <u>aff'd</u>, 147 Wn.2d 288, 53 P.3d 974 (2002).

03         Giles relies on <u>State v. Peterson</u>, 2 Wn. App. 464, 469 P.2d 980 (1970).  In
Peterson, the defendant's theory was that the indecent liberties charge pursued by the
04    victim and her mother was instigated by the victim's older sister.  The trial court
sustained the State's objections and did not permit the defendant to inquire about the
05    sister's contentious relationship with the defendant, the sister's involvement in
pressing charges against him, or the sister's control over the victim's mother.  This
06    court ruled that the trial court erred and the defendant should have been able to
pursue this defense.  <u>Peterson</u>, 2 Wn.App. at 467.

07

08         But here, Giles's proposed cross examination of the ESSAC evaluator did not
relate to the charges against him.  Giles did not establish a connection between the
09    unsubstantiated allegations and the disclosures made by E.  As the trial court correctly
ruled, the evidence offered by Giles in support of his argument was remote, vague,
10    and speculative:  the alleged events occurred more than ten years before she
interviewed E. and there was no way of verifying the allegations and whether the
11    evaluator's actions were warranted.  The trial court did not abuse its discretion in
precluding this inquiry.

12    (Dkt. 22, Ex. 2 at 7-12; text of some footnotes bracketed, other footnotes omitted.)  Petitioner

13    fails to demonstrate that these findings were contrary to or involved an unreasonable application

14    of federal law.  Instead, the state court reasonably concluded that the evidence as to Yeung's

15    journal entries and fictional writings and his argument of a conspiracy, as well his argument as to

16    Todd's history, were unsupported and not relevant to the charges against him.  The Court further

17    notes the prejudicial effect of these proposed lines of inquiry and the fact that petitioner's counsel

18    conducted extensive cross-examinations of these witnesses on the issues critical to this case.  For

19    these reasons, petitioner's fourth ground for relief should also be denied.[4]

20

21       [4] Petitioner also raised an argument in this ground for relief related to the Supreme Court's
decision in *Crawford v. Washington*, 541 U.S. 36 (2004).  (*See* Dkt. 1 at 32-33 and Dkt. 32 at 58-
22    59.)  However, because this argument necessarily assumes the existence of a confrontation clause
violation and no such violation occurred here, it need not be addressed.

REPORT AND RECOMMENDATION
PAGE -38

E.        Ground Five

Petitioner raises another confrontation clause argument in his fifth ground for relief, asserting that his daughter's out-of-court statements should not have been admitted absent a showing that the statements contained particularized guarantees of trustworthiness.  He focuses particularly on the statements made by his daughter to Todd and asserts that these witnesses were essentially unavailable to cross-examination "when it mattered" (Dkt. 32 at 61).  However, the Court agrees with respondent that this ground for relief lacks merit.

Testimonial hearsay statements are barred under the confrontation clause unless the declarant is unavailable and the defendant had prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004).[5]  There is no confrontation clause violation where the declarant testifies and is subject to cross-examination.  *California v. Green*, 399 U.S. 149, 158-64 (1970).  *See also United States v. Valdez-Soto*, 31 F.3d 1467, 1470 (9th Cir. 1994) ("We are aware of no Supreme Court case, or any other case, which holds that introduction of hearsay evidence can violate the Confrontation Clause where the putative declarant is in court, and the defendants are able to cross-examine him.")

In this case, petitioner's daughter testified in court and petitioner fails to establish that he was denied effective cross-examination of either his daughter or Todd.  "[T]he Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *United States v. Owens*, 484 U.S. 554, 559 (1988) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987)

_____

[5] The Court assumes only for the purposes of this discussion that the out-of-court statements at issue were testimonial.

REPORT AND RECOMMENDATION
PAGE -39

01 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985))) (emphasis in original). Petitioner again

02 fails to establish the existence of any constitutional violation and his fifth ground for relief should

03 be denied.

04 F.    Ground Six

05       In his sixth ground for relief, petitioner argues that comments made in the prosecutor's

06 closing argument violated his constitutional rights. He alleges that the prosecutor impermissibly

07 commented on his right to be present at trial, engaged in perjorative name calling, and misstated

08 the evidence.

09       In evaluating a claim of prosecutorial misconduct, "[t]he relevant question is whether the

10 prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction

11 a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly*

12 *v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In order to assess a claim that a prosecutor's

13 comments constitute a due process violation, it is necessary to examine the entire proceedings and

14 place the prosecutor's statements in context. *See Greer v. Miller*, 483 U.S. 756, 765-66 (1987).

15 Here, the Court finds no basis for petitioner's prosecutorial misconduct claim.

16       1.    Disparaging Remarks:

17       The Washington Court of Appeals described and assessed petitioner's claim as to

18 disparaging remarks made by the prosecutor as follows:

19       Giles argues that the prosecutor engaged in personal attacks by calling him a
         "jerk," "arrogant," and "self-absorbed."
20

21       In closing argument, the prosecutor anticipated five "themes" of the defense:
         "Number One, I suspect, is going to be a big one. Mr. Giles is arrogant and
         insufferable. But hey, don't hold that against him." . . . "Let's talk about this very
22       quickly. First one is, basically, David Giles is a jerk. But . . . he didn't commit this

REPORT AND RECOMMENDATION
PAGE -40

01   crime."

02          The prosecutor also argued:

03          My guess is going to be, the approach is going to be, this case is not about
            who you like or who you don't like.  In other words, the defendant may be
04          arrogant and self-absorbed and the master of control. But don't hold that
            against him.  Turn that vice into a virtue.

05

06          Giles objected to the "repeated name calling" and the trial court overruled the
     objection.

07          It is well established that a prosecutor must refrain from making remarks
     which are not based on facts in evidence but are an attempt to inflame the jury and
08   disparage the defendant or defense counsel.  State v. Copeland, 130 Wn.2d 244, 290,
     922 P.2d 1304 (1996).  However, in the context of the argument, these comments
09   were not disparaging personal attacks on Giles, but rather anticipated what Giles
     would argue.  Moreover, Giles has not shown that the remarks were prejudicial and
10   affected the outcome of the trial.

11   (Dkt. 22, Ex. 2 at 13; footnotes omitted.)

12          As accurately noted by the state court, the prosecutor made the bulk of these comments

13   in anticipating petitioner's counsel's closing arguments.  ( See Dkt. 52, Ex. 60 at 57-58.)  Yet,

14   petitioner's counsel did not make the anticipated argument and, instead, objected to the

15   prosecutor's "name calling."  (Id. at 58 and 83.)  However, "'is not enough that the prosecutors'

16   remarks were undesirable or even universally condemned.'"  Darden, 477 U.S. at 181 (quoted

17   source omitted).  The question is whether it can be said that the "prosecutors' comments 'so

18   infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Id.

19   (quoting Donnelly, 416 U.S. at 643).

20          In this case, it cannot be said that the prosecutor's comments deprived petitioner of a fair

21   trial.  In expanding on the anticipated argument, the prosecutor appropriately asked the jury to

22   consider petitioner's demeanor, as shown both through the evidence and through petitioner's

REPORT AND RECOMMENDATION
PAGE -41

01   behavior at trial.   (Dkt. 52, Ex. 60 at 58-61.)  He also tied the issue into petitioner's counsel's

02   opening statement and his theories at trial: "Why does it count?  Because the defendant made it

03   an issue, made his demeanor an issue, beginning in opening statement.  Remember Mr. Ellis said,

04   the defendant was a complainer, the defendant was only interested in the children's welfare, all of

05   the professionals disliked him, therefore, they are conspired against him.  He made it an issue.

06   That's why we are talking about it, and that's why it's important." ( *Id*. at 59.)   While the

07   prosecutor's choice of words may have been undesirable, the argument itself was reasonable.  *See*

08   *generally Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 898 (9th Cir. 1996) ("The arguments of counsel

09   are generally accorded less weight by the jury than the court's instructions and must be judged in

10   the context of the entire argument and the instructions.") (citing *Boyde v. California*, 494 U.S.

11   370, 384 (1989)).   Moreover, considering the trial and evidence presented as a whole, the

12   prosecutor's use of the challenged words in a brief portion of his closing remarks cannot be said

13   to have so infected the trial with unfairness as to result in a denial of due process.  *See*, *e.g.*, *Hall*

14   *v. Whitley*, 935 F.2d 164, 165-66 (9th Cir. 1991) (dismissing prosecutorial misconduct claim

15   where prosecutor's remarks were "isolated moments in a three day trial.")

16        2.     Misstatement of Evidence:

17        The Washington Court of Appeals also rejected petitioner's argument as to misstatement

18   of the evidence:

19        Giles claims the prosecutor intentionally misstated the evidence.

20        In rebuttal, the State responded to Giles's argument that he was not guilty
        because he contacted E.'s teachers and encouraged E. to discuss any problems at
21        home with them.  The State claimed that if Giles were genuinely interested in having
        E. talk to her teachers, he would have contacted E.'s social studies and language arts
22        teacher who was also the school gymnastics coach.  The prosecutor argued that E.

REPORT AND RECOMMENDATION
PAGE -42

01  spent three to five hours per day with this teacher in class and in gymnastics. [At the
time, E. was apparently in a private gymnastics club and was not a member of the
02  school team.] Because E. did not participate on the school gymnastics team, this part
of the argument misstated the evidence. [Giles himself objected to this misstatement
03  and after closing argument, his lawyer noted the objection.] But in the context of the
entire argument, this misstatement of the evidence was insignificant. There is no
04  reasonable probability that it affected the outcome of the trial.

05  (Dkt. 22, Ex. 2 at 14; text of footnotes bracketed.) As found by the state court, there is no basis

06  for concluding that this misstatement by the prosecutor deprived petitioner of a fair trial. Instead,

07  viewed within the context of the trial as a whole, the prosecutor's comments were "isolated

08  moments in a three day trial[,]" *Hall*, 935 F.2d at 165-66, that cannot reasonably be said to have

09  so infected the trial with unfairness as to result in a denial of due process.

10          3.      Comment on Right to be Present at Trial:

11          In considering petitioner's final prosecutorial misconduct argument, the Washington Court

12  of Appeals stated:

13          Giles contends the prosecutor violated his constitutional rights and engaged
in misconduct when he suggested that Giles's nine-year-old son, D., was not
14  forthcoming when he testified because Giles was present. [The trial court overruled
Giles's objection to this argument.] The prosecutor argued:

15

16          [D.] is the star witness, called by the defense counsel because he would be
able to confirm whether he saw his father walk around naked. I will remind
you, [D.] could not remember more than one occasion in which he slept with
17  his father. And no one has ever doubted, even the defendant admits, that his
son slept with him every night that he could.

18

19          So [D.], frankly, simply didn't remember or recall. Or the fact of the
matter is, his father is sitting about 10 feet away from him in this courtroom.
How willing is he going to be able to talk about what he's seen at home?

20

21          An accused person has a right under the federal and state constitutions to be
present at trial. U.S. Const., amendments 5, 6, 14; Wash. Const. Art. 1, sec. 22; State
v. Thomson, 123 Wn.2d 877, 880, 872 P.2d 1097 (1994); United States v. Gagnon,
22  470 U.S. 522, 526, 105 S. Ct. 1482, 84 L.Ed.2d 486 (1985). The State may chill the

REPORT AND RECOMMENDATION
PAGE -43

01   defendant's constitutional rights by highlighting the defendant's exercise of a
constitutional right and thereby suggest that the jury draw a negative inference. See,
02   e.g., United States v. Jackson, 390 U.S. 570, 88 S. Ct. 1209, 20 L.Ed.2d 138 (1968);
State v. Mace, 97 Wn.2d 840, 844, 650 P.2d 217 (1982).  The State may not
03   comment on or argue unfavorable inferences from the defendant's exercise of a
constitutional right. See, e.g., State v. Fiallo-Lopez, 78 Wn. App. 717, 729, 899 P.2d
04   1294 (1995) (improper for prosecutor to comment on the defendant's failure to
testify).  But argument touching upon a defendant's exercise of his constitutional
05   rights may be permissible, "so long as the focus of such questioning or argument is
not upon the exercise of the constitutional right itself." State v. Miller, 110 Wn. App.
06   283, 284, 40 P.3d 692, rev. denied, 147 Wn.2d 1011 (2002) (comment that defendant
had the opportunity to tailor his testimony after hearing the testimony of all other
07   witnesses in court did not infringe upon the defendant's constitutional rights).

08            In closing argument, "a prosecutor is afforded wide latitude in drawing and
expressing reasonable inferences from the evidence, including commenting on the
09   credibility of witnesses and arguing inferences about credibility based on evidence in
the record." State v. Millante, 80 Wn. App. 237, 250, 908 P.2d 374 (1995).  The
10   prosecutor may draw the jury's attention to any fact in evidence that diminishes or
increases the trustworthiness of the witness. State v. Robideau, 70 Wn.2d 994, 998,
11   425 P.2d 880 (1967); State v. Jefferson, 11 Wn. App. 566, 568, 524 P.2d 248 (1974).

12            Giles argues that the prosecutor's statement improperly invited the jury "to
infer guilt" from his exercise of his constitutional right to be present at trial.  But the
13   focus of the prosecutor's argument was not Giles's exercise of his right to be present
at trial, but D.'s reaction to Gile's presence.  In Coy v. Iowa, 487 U.S. 1012, 1020,
14   108 S. Ct. 2798, 101 L.Ed.2d 857 (1988), the U.S. Supreme Court held that one of
the purposes of the confrontation clause is to allow the factfinder to assess a witness's
15   responses and acknowledged that confrontation may "upset the truthful rape victim
or abused child." Even then, confrontation assists the jury in evaluating the credibility
16   of the witnesses. Maryland v. Craig, 497 U.S. 836, 845-46, 110 S. Ct. 3157, 111
L.Ed. 2d 666 (1990).  Therefore, a comment about the credibility of a witness based
17   on his response to confrontation with the defendant is not improper and is consistent
with the purposes of confrontation.

18

19            In this case, the prosecutor did not ask the jury to infer guilt from Giles's
exercise of his right to be present at trial, but commented on D.'s credibility and drew
20   an inference from the father-son relationship between D. and Giles.  This is not
inconsistent with the purposes of the confrontation clause.  In any event, the jury
21   could not have inferred guilt from this comment.  D. was Giles's witness and there
were no allegations of abuse regarding D.  There is no likelihood that the jury
22   understood this argument as an impermissible comment on Giles's constitutional right
to be present at trial and there was no misconduct.

01 (Dkt. 22, Ex. 2 at 14-17; text of some footnotes bracketed, other footnotes omitted.)

02        As found by the state court, the prosecutor appropriately targeted the testimony and

03 credibility of petitioner's witness.  The mere fact that one of the prosecutor's arguments

04 mentioned petitioner's presence at trial does not establish a violation of his constitutional rights.

05 *See*, *e.g.*, *Portuondo v. Agard*, 529 U.S. 61, 66-73 (2000) (prosecutor did not violate a

06 defendant's constitutional right to be present at trial by commenting on his opportunity to tailor

07 his testimony after hearing other witnesses testify; noting that the comments did not suggest

08 evidence of guilt, but rather properly concerned the defendant's credibility as a witness); *United*

09 *States v. Olano*, 62 F.3d 1180, 1196 (9th Cir. 1995) ("The prosecutor's remark commented only

10 on the failure of defense witnesses to provide certain testimony, not on Olano's failure to testify

11 on his own behalf. This was not improper[.]") Accordingly, as with the arguments addressed

12 above, petitioner fails to establish any prosecutorial misconduct.

13 G.     <u>Ground Seven</u>

14        Petitioner asserts that the trial court erred in failing to remove biased jurors.  As reflected

15 above, the state court rejected this argument, noting that one of the identified jurors was excused

16 and that "although some [others] admitted to having strong feelings about child abuse, they all

17 indicated that they could be objective and fair and defense trial counsel did not exercise a challenge

18 for cause as to any of these jurors." (Dkt. 22, Ex. 2 at 22.)  Petitioner argues in his seventh ground

19 for relief the actual and/or implied bias of six different jurors (juror numbers 3, 29, 35, 48, 57 and

20 63) and maintains the trial judge should have removed those jurors for cause.

21        As stated above, actual bias means "bias in fact, . . . typically found when a prospective

22 juror states that he can not be impartial, or expresses a view adverse to one party's position and

REPORT AND RECOMMENDATION
PAGE -45

01   responds equivocally as to whether he could be fair and impartial despite that view[,]" *Fields*, 503

02   F.3d at 767, whereas implied bias exists only in "those extreme situations where the relationship

03   between a prospective juror and some aspect of the litigation is such that it is highly unlikely that

04   the average person could remain impartial" or where there is the "potential for substantial

05   emotional involvement, adversely affecting impartiality[,]" *Tinsley*, 895 F.2d at 527 (internal

06   quotation marks and citations omitted).  Petitioner bears the burden of establishing that a juror

07   lacks impartiality. *Wainwright v. Witt*, 469 U.S. 412, 423 (1985).  In evaluating a claim of juror

08   impartiality, deference must be paid to a state trial judge's determination of bias. *Id.* at 426-30;

09   *accord Uttecht v. Brown*, ___ U.S. ___, 127 S.Ct. 2218, 2223-24 (2007).

10          Respondent argues that this claim fails based on petitioner's failure to rebut the state court

11   findings as to these jurors.  However, there were no challenges to the jurors in question raised at

12   trial.  In any event, the Court otherwise agrees with respondent that petitioner fails to establish he

13   was denied the right to an impartial jury.

14          As reflected above, petitioner fails to establish the existence of bias on the part of jurors

15   3 or 63.  Additionally, juror number 57 was not seated on the jury, removing the threat of any

16   constitutional harm.  *See Comer v. Schriro*, 480 F.3d 960, 990 (2007) ( "Even if the trial court

17   erred in failing to strike the two venirepersons in question, such error does not constitute an

18   unconstitutional denial of a fair and impartial jury unless the venirepersons sit on the jury. Because

19   Thrailkill and Wilborn were not members of Comer's jury, he suffered no constitutional harm.")

20   (internal citation to *United States v. Martinez-Salazar*, 528 U.S. 304 (2000)).

21          Nor does the record reflect the existence of actual or implied bias on the part of the

22   remaining jurors. The record contradicts petitioner's assertion that juror number 29 expressed his

REPORT AND RECOMMENDATION
PAGE -46

01  misunderstanding as to the burden of proof in a criminal case.  (Dkt. 52, Ex. 45 at 24-25, 88-89

02  and Ex. 46 at 21-22.)  Also, although juror numbers 35 and 48 revealed experiences involving

03  sexual abuse/crimes involving their daughter and friend/coworker respectively, their statements

04  concerning those experiences do not reflect an unlikelihood that they could remain impartial.  (*Id*.,

05  Ex. 45 at 34-36, 38-39, 91-93 and Ex. 46 at 32-33.)

06      The Washington Court of Appeals decision on this issue was neither contrary to nor an

07  unreasonable application of federal law.  Because petitioner fails to establish the existence of any

08  constitutional violation, his seventh ground for relief should be denied.

09  H.    <u>Ground Eight</u>

10      In his eighth ground for relief, petitioner argues that opinions of his guilt offered by

11  McGuire and Todd violated his right to due process.  He points specifically to McGuire's

12  testimony that petitioner's daughter's demeanor was consistent with a child who may have been

13  sexually abused (Dkt. 52, Ex. 52 at 129) and the fact that Todd told petitioner's daughter that

14  petitioner had told someone he did something to her (*id*., Ex. 53 at 20, 88, 117-20).  He asserts

15  that Todd "evidently believed" he had confessed and "admitted she was prejudiced from the

16  outset." (Dkt. 1 at 45).

17      In considering arguments as to McGuire, the Washington Court of Appeals determined

18  they were "not supported by the record or relate to the weight McGuire's testimony should be

19  given, not its admissibility."  (Dkt. 22, Ex. 2 at 21.)  Respondent asserts that the challenged

20  evidence was properly admitted and that petitioner fails to show that an evidentiary error rendered

21  his trial fundamentally unfair and caused actual prejudice.

22      Federal habeas relief does not lie for errors of state law.  *Estelle v. McGuire*, 502 U.S. 62,

01 | 67-68 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). "Claims of inadmissibility of evidence

02 | are cognizable in habeas corpus proceedings only when admission of the evidence violated the

03 | defendant's due process rights by rendering the proceedings fundamentally unfair." *Hamilton v.*

04 | *Vasquez*, 17 F.3d 1149, 1159 (9th Cir. 1994). Habeas relief requires a showing of actual prejudice.

05 | *Brecht,* 507 U.S. at 638.

06 | In this case, petitioner's assertions as to McGuire and Todd are not supported by a review

07 | of the record. (*See* Dkt. 52, Exs. 51-53.) Nor can it be said that the admission of the testimony

08 | specifically targeted by petitioner, even if erroneous, rendered the proceedings fundamentally

09 | unfair and resulted in actual prejudice. As such, petitioner's eighth ground for relief lacks merit

10 | and should be denied.[6]

11 | I. Ground Nine

12 | Petitioner argues in his ninth and final ground for relief that multiple errors in this case

13 | cumulatively so infected the trial with unfairness so as to constitute a violation of his right to due

14 | process. Finding no errors, the Washington Court of Appeals denied this claim. (Dkt. 22, Ex. 2

15 | at 18-19.) Respondent avers a lack of clearly established federal law based on Supreme Court

16 | precedent as to this argument and argues that, in any event, petitioner fails to show the existence

17 | of even any single prejudicial error. The Court agrees with respondent. Petitioner fails to

18 | establish prejudicial error either individually or cumulatively and, as such, his ninth ground for

19 |

20 | [6] In his reply, petitioner appears to target the testimony of McGuire and Todd as experts.

21 | However, McGuire and Todd did not testify as expert witnesses. In his ninth ground for relief, petitioner avers that Berliner, who offered rebuttal testimony to petitioner's expert witness, also

22 | "concluded" his guilt. (Dkt. 1 at 46.) As with McGuire and Todd, the record does not support this contention. (Dkt. 52, Ex. 59 at 126-73.)

REPORT AND RECOMMENDATION
PAGE -48

01 relief should also be denied.

02                                    IV

03        Petitioner's habeas petition should be denied, and this action dismissed.  A proposed Order

04 of Dismissal accompanies this Report and Recommendation.  Neither discovery nor an evidentiary

05 hearing is required as the record conclusively shows that petitioner is not entitled to relief.

06 Accordingly, petitioner's motions for discovery and for an evidentiary hearing (Dkts. 33 & 34)

07 should also be denied.

08        DATED this 28th day of January, 2008.

09

10                                    _____
                                      Mary Alice Theiler
11                                    United States Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

REPORT AND RECOMMENDATION
PAGE -49